# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF FLORIDA
# PENSACOLA DIVISION

| | |
|---|---|
| CHANDRA KANTOR, as Personal Representative of the Estate of HANUMAN JOYCE and Survivors, CHANDRA KANTOR, Mother, and RAMAYANA BABA, Father,<br><br>　　　Plaintiff,<br><br>v.<br><br><br>WARDEN JOHN SLOAN, in his individual capacity, OLUGBENGA OGUNSANWO, MD, individually; CORIZON HEALTH, INC., a health services corporation; DANIEL CHERRY, DO, individually; CHRISTINE NOBLES, individually; AMANDA SNEED, individually; BAPTIST HOSPITAL, INC.; HAITHAM QADER, MD, individually; SURENDAR S. VEERA, MD, individually; SCOTT M. HOF, individually; JOHN FARISH, individually, BRIAN LEE CARTHAN, individually; and CORRECTIONS OFFICERS JOHN DOE 1 and 2, individually, and FDOC JOHN DOE 3-6, individually.<br><br>　　　Defendants. | Civil Division<br><br><br><br><br><br><br><br>Case No. 3:16-cv-449<br><br><br><br><br><br><br><br><br><br>Jury Trial Demanded |

# PLAINTIFF CHANDRA KANTOR'S OMNIBUS RESPONSE IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

Plaintiff Chandra Kantor, through her attorneys, submits this response in opposition to Defendants' motions to dismiss.

## INTRODUCTION

Generally speaking, all Defendants plead ignorance to decedent's condition and argue, on that basis, that they should be dismissed from the case. However, unlike most Eighth Amendment failure to treat cases, Hanuman Joyce was not in jail or in custody and requesting medical treatment that was delayed or not provided. Rather, Hanuman was *already* in an emergency or quasi-emergency situation: he was being given an urgent medical transport between hospitals. Further, all Defendants were well *aware* of that fact. Thus, it is impossible for *any* of the Defendants to argue they did not know this gravely ill man did not have serious medical needs; needs which they all played a part in delaying or denying.

## FACTS

Although some Defendants have included self-serving "Statement of Facts," the authoritative version of the facts alleged is still the Plaintiff's Amended Complaint. Still, the following summary may be helpful to the Court.

Decedent Hanuman Joyce was a 21-year-old inmate of Century Correction Institute ("CCI") serving a six-year sentence on a non-violent burglary conviction. Amended Complaint ("Complaint" or "AC"), ¶¶ 18, 24. In 2010, Hanuman was diagnosed with lupus. *Id*. at ¶ 20. In February 2015, Hanuman was sent to the CCI

infirmary with complaints of fever, vomiting, weakness, and sudden weight loss. *Id*. at ¶ 28.  After suffering a seizure, Hanuman was taken by ambulance to the emergency room at Baptist Hospital on February 21, 2015. *Id*. at ¶ 32.  Over the next 10 days, Hanuman was treated for lupus nephritis, lupus flare, influenza B, seizure, hyperkalemia, metabolic acidosis, anemia, and acute renal failure. *Id*. at ¶ 33.  Tests showed elevated Liver Function Tests ("LFTs") throughout his stay, indicating liver inflammation. *Id.*  Throughout Hanuman's stay in the hospital, Hanuman's mother, Plaintiff Chandra Kantor, was in continual email and phone communications with Baptist Hospital and Corizon Health, Inc. personnel as well as Dr. Olugbenga Ogunsanwo and Warden John Sloan. *Id*. at ¶¶ 36-40.

On the afternoon of March 2, 2015, still suffering from lupus nephritis, kidney failure, anemia, influenza, hyperkalemia, and metabolic acidosis, Hanuman was transported from Baptist Hospital to Reception and Medical Center ("RMC"). Despite Hanuman's grave condition, no doctor at Baptist Hospital saw Hanuman in the eight hours before he was discharged. *Id*. at ¶ 151.  Personnel at Baptist Hospital did not provide FDOC corrections officers with any instructions regarding continuity of care while Hanuman was being transported or coordinate with the FDOC or Corizon Health, Inc. *Id*. at ¶ 58.  There were no medical personnel, discharge instructions, or support provided despite Hanuman's being transported across the state, on a trip scheduled to take approximately five hours. *Id*. at ¶ 59.

The transfer order and related documentation directed Hanuman to be transferred in an FDOC van "directly from Baptist Hospital to RMC Hospital." *Id*. at ¶ 53.  The order specifically stated: "Century CI will transport inmate direct from Baptist Hospital via FDOC van to RMC for gain of custody.  Handle and house accordingly." *Id*. at ¶ 56.  Additionally, the request attached to the order was marked "urgent," not routine, with "inmate requires hosp care" listed as the clinical rationale.  *Id*. at ¶ 55.  However, the Order did not provide for coordination of continuity of care between health officers and none was arranged. *Id*. at ¶ 57.

Even though Hanuman Joyce was seriously ill and the transfer order stated he was to be taken directly to RMC, John Doe Corrections Officers 1-2 first drove to CCI, ostensibly to retrieve Hanuman's medical records but needlessly adding hours to Hanuman's already lengthy transport.  At approximately 5:50 PM on March 2, 2015, Corrections Officers John Farish and Brian Lee Carthan took over Hanuman's transport. *Id*. at ¶ 80.  The journey from CCI to RMC is 320 miles – less than a five hour drive.  At two separate points in the trip, Carthan and Farish were alerted to trouble in the back of the van.  Once, Hanuman tried to signal his distress by kicking the side of the van. *Id*. at ¶ 87.  The officer told Hanuman Joyce to stop kicking and be quiet.  *Id*. at ¶ 88.  Additionally, at another point in the trip, Officer Carthan heard Hanuman Joyce making what Carthan described as a "weird

noise," but again did not try to investigate, despite being in the midst of an urgent medical transport of a seriously ill individual. *Id*. at ¶¶ 91-92.

Despite being scheduled for five hours, Officers Carthan and Farish did not reach RMC until almost 3:00 AM on the morning of March 3, 2015 – eight hours after leaving CCI and close to ten hours after Hanuman had left Baptist Hospital. *Id*. at ¶ 97.   When they arrived at RMC, Officers Carthan and Farish found Hanuman on his side and unresponsive.   No life-saving measures were initiated and Hanuman was pronounced dead at the scene. *Id*.

During Hanuman's stay at Baptist Hospital, his mother was in touch with FDOC Director of Health Services Defendant Dr. Olugbenga Ogunsanwo ("Defendant") regarding Hanuman's condition and the treatment he was receiving. AC, ¶ 36-40.   Under FDOC regulations, it is the Director's responsibility to coordinate staff for medical transports.   However, despite Hanuman's transfer order being marked "urgent", an instruction that Hanuman was to be taken "directly" to RMC for "hosp[ital] care", and an instruction that he was to be handled and housed "accordingly," Dr. Ogunsanwo made no additional arrangements for Hanuman's transport. *Id* at ¶ 48.   No special discharge instructions were provided. *Id*.   No ambulance was provided. *Id*.   No medical equipment, medication, or hydration was provided. *Id*.   And no medical staff was provided. *Id*.   Instead, a gravely ill Hanuman was shackled upright in the back of a

FDOC van for what was ostensibly a less than five-hour drive to RMC. *Id*. at 73. After a total of about 11 hours in the van, Hanuman was dead.

Defendant John Sloan ("Defendant") was at all relevant times the Warden of CCI. Defendant oversaw all policies, procedures, and training regarding the transport of inmates and for the execution of the transfer order, including briefing and coordination of subordinates.  AC, ¶ 7.  Plaintiff could more clearly allege that Sloan reviewed Mr. Joyce's file, was copied on discussions at the time of Mr. Joyce's hospitalization, and allowed Plaintiff to visit her son based on the severity of his condition.  Defendant Sloan also was in contact with personnel at Baptist Hospital, including Defendant Amanda Sneed, and was copied on the transport order transferring Hanuman from Baptist to RMC.

Plaintiff has brought three counts against Defendants: a claim under 42 U.S.C. § 1983 for violation of decedent's Eighth Amendment rights (Count I); violation of F.S. §395.1041 (Count II) and negligence (Count III).  Defendants Carthan, Farish, Ogunsanwo, Sloan, Baptist Hospital, Veera, Hof, Sneed, and Qader have all moved to have the claims against them dismissed.

## ARGUMENT

I.    **Plaintiff Has Stated an Eighth Amendment Claim Against Defendants Farish, Carthan, Ogunsanwo, And Sloan, and Defendants Ogunsanwo And Sloan Are Not Entitled To Qualified Immunity**

A.    **Deliberate Indifference Under the Eighth Amendment**

"To prevail on a deliberate indifference to serious medical need claim, Plaintiffs must show: (1) a serious medical need; (2) the defendants' deliberate indifference to that need; and (3) causation between that indifference and the plaintiff's injury." *Goebert v. Lee County*, 510 F.3d 1312, 1326 (11th Cir.2007).

A serious medical need is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Hill v. Dekalb Reg'l Youth Det. Ctr.*, 40 F.3d 1176, 1187 (11th Cir.1994). A serious medical need is determined by whether a delay in treating the need worsens the condition. *Id.* at 1188–89. To prove deliberate indifference, a plaintiff must show: "(1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; and (3) conduct that is more than mere negligence." *Brown v. Johnson*, 387 F.3d 1344, 1351 (11th Cir.2004).

Under a theory of supervisory liability, personal involvement is not necessarily required for a claim of deliberate indifference. Supervisory liability lies where the defendant participates in the unconstitutional conduct *or* there is a causal connection between such conduct and the defendant's actions. There are three ways to establish such a causal connection:

> when a history of widespread abuse puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he fails to do so. *Alternatively*, the causal connection may be established when a supervisor's custom or policy result[s] in deliberate indifference to constitutional rights or when facts support an inference that the supervisor

> directed the subordinates to act unlawfully or knew that the subordinates
> would act unlawfully and failed to stop them from doing so.

*Cottone v. Jenne*, 326 F.3d 1352, 1360-61 (11th Cir. 2003) (internal quotations omitted) (emphasis added).

## B. Plaintiff Has Stated a Claim For Deliberate Indifference Against Officers Farish and Carthan (Doc. Nos. 48 and 49)

Officers Farish and Carthan argue that Plaintiff has failed to state for deliberate indifference. (Doc. Nos. 48 and 49). However, this argument is belied by a quick review of Plaintiff's Amended Complaint.

Hanuman Joyce was being treated for lupus nephritis, kidney failure, anemia, influenza, hyperkalemia, and metabolic acidosis, AC, ¶¶ 32-35. Thus, the first element of a deliberate indifference claim is readily met.

The deliberate indifference element is also readily met. As Officers Farish and Carthan rightfully point out, discussions of a defendant's subjective knowledge typically focus on the defendant's position, profession, and training. *See, e.g., Greason v. Kemp*, 891 F.2d 829, 835 (11th Cir. 1990). Such an inquiry is more appropriate at the summary judgment stage, once a record of the defendant's background has been developed. *Id*. Conversely, at this stage of the litigation, when there is no record, such an inquiry is premature.

However, even without knowing the salient features of their backgrounds, the Amended Complaint amply demonstrates that Officers Farish and Carthan

knew of Hanuman Joyce's serious medical need. Officers Farish and Carthan were undertaking a *medical* transport, moving Hanuman between Baptist Hospital and RMC. Additionally, Hanuman's transfer order stated that Hanuman was to be transferred *directly* from Baptist Hospital to RMC. (AC, ¶ 53). The order stated twice that the transfer was for medical services, *id.* at ¶ 57, and that Hanuman should be handled and housed accordingly, *id*. at ¶ 56. The order was also marked "Urgent". *Id*. at 55. Finally, Hanuman was visibly ill and had been bed-ridden and too weak to walk throughout his stay at Baptist. *Id*. at ¶ 35.

Unlike the warden in *Brooks v. Stringer*, 303 Fed. Appx. 225 (5th Cir. 2008), who was high in the management structure at the prison and therefore arguably might not have known about the risk of violence to a particular inmate, Officers Farish and Carthan were given transport orders that stated that Hanuman's *medical* transport was *urgent* and that he should be *handled and housed accordingly*. Hanuman was not some unknown inmate in a vast prison – he was their *one and only passenger* on an eight-hour van ride.

Again, even without discovery, what is already known about Hanuman's transport more than supports Plaintiff's allegations that Officer Farish's and Officer Carthan's withholding and delaying of medical treatment disregarded the serious risk to Hanuman. Officers Farish and Carthan shackled Hanuman, a seriously ill individual, upright in a prison van. *Id*. at ¶73. They did not check on

Hanuman throughout the entirety of the trip.  When Hanuman struggled to signal Officers Farish and Carthan, rather than stop the van to see what was wrong, they told him to keep quiet. *Id*. at ¶¶ 86-88.  They ignored the audible gurgling sounds coming from the back of the van. *Id*. at ¶¶ 91-93.  And they took eight hours to make an "urgent" and "direct" medical transport from CCI to RMC – a journey which should have taken a little over half that time. *Id*. at ¶ 97.  On the whole, while Officers Farish and Carthan did not offer as colorful a commentary as those in *Barreto v. County of Suffolk*, 762 F. Supp. 2d 482 (2nd Cir. 2011), their actions amply demonstrated that they refused to do anything to address or ameliorate Hanuman's rapidly deteriorating condition despite knowing he was a hospital patient on an urgent transport and despite Hanuman's attempts to signal his distress.  Instead, Officers Farish and Carthan *delayed* Hanuman's treatment, inexplicably nearly *doubling* the transport time between CCI and RMC.

### C. Neither Dr. Ogunsanwo Nor Warden Sloan Are Entitled to Qualified Immunity (Doc. Nos. 47 and 52)

Dr. Ogunsanwo and Warden Sloan both argue in their motions to dismiss that they are entitled to qualified immunity. (Doc. Nos. 47 and 52).  However, they are not entitled to qualified immunity because they both violated Hanuman Joyce's Eighth Amendment rights and the contours of this right were well-established at the time of the incident.

### 1.  Qualified Immunity

For government officials to enjoy qualified immunity, they must first establish that they were acting within the scope of their discretionary authority when the alleged wrongful acts occurred. *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002). Here, no one disputes that Defendants were acting in the scope of their discretionary authority during the period in which they interacted with Hanuman Joyce.  Once it has been determined that an official is acting with the scope of his discretionary authority, the burden shifts to the plaintiff to establish that qualified immunity is inappropriate. *Id*.  First, the plaintiff must show that the official's alleged conduct violated a constitutionally protected right.  Second, the plaintiff must demonstrate that the right was clearly established at the time of the misconduct. *Grider v. City of Auburn*, 618 F.3d 1240, 1254 (11th Cir. 2010).

**2. Qualified Immunity Should Not Be Granted Here Because Defendants' Conduct Violated Hanuman Joyce's Eighth Amendment Rights**

Dr. Ogunsanwo and Warden Sloan should not be entitled to qualified immunity because their deliberate indifference to Hanuman Joyce's serious medical need violated Hanuman Joyce's Eighth Amendment rights.

Dr. Ogunsanwo attempts to evade liability by minimizing his involvement in Hanuman's transport from Baptist Hospital to RMC, characterizing his role as that of a mere "consultant."  However, this self-serving characterization is belied by

what is already known about the circumstances of the transport as well as Dr. Ogunsanwo's role in the FDOC.

Throughout Hanuman Joyce's stay at Baptist Hospital, his mother was in contact by phone and by email with the staff at Baptist Hospital as well as Defendant. Dr. Ogunsanwo was therefore apprised of both Hanuman Joyce's chronic condition (lupus) as well as his acute conditions (lupus nephritis, renal failure, anemia, influenza, hyperkalemia, and metabolic acidosis). Dr. Ogunsanwo was also in contact with individuals from Corizon Health, Inc. and Baptist Hospital, and therefore well aware of Hanuman Joyce's grave condition and the serious risk of harm should adequate medical care be delayed or denied.

And Dr. Ogunsanwo knowingly disregarded the serious risk of harm to Hanuman. As Director of Health Services, he was to ensure that adequate provisions were made for Hanuman's transport between hospitals. However, even though an urgent transfer order was issued to directly transport Hanuman to RMC and to handle and house him accordingly, Dr. Ogunsanwo made no such provisions. (AC, ¶ 48). He failed to provide an ambulance. *Id*. He failed to provide medical staff or medical equipment. *Id*. He failed to coordinate with Baptist Hospital or provide discharge instructions to the corrections officers transporting Hanuman. *Id*. Knowing FDOC personnel were transporting a gravely

ill individual across the length of the state, Dr. Ogunsanwo did nothing to prevent Hanuman's condition from further deteriorating, ultimately leading to his death.

Warden Sloan argues he could not be deliberately indifferent to Hanuman Joyce's serious medical condition because there are no allegations he was *aware* of it.  However, Warden Sloan allowed Plaintiff to visit Hanuman Joyce while he was at Baptist Hospital – an allowance which Warden Sloan informed Plaintiff was only made for extremely sick inmates.  Additionally, Warden Sloan corresponded with personnel at Baptist Hospital, according to Amanda Sneed, regarding Hanuman Joyce's condition, and was copied on the order transferring Hanuman Joyce from Baptist Hospital to RMC for further medical treatment.[1]

Aware of the risk of serious harm to Hanuman Joyce should medical treatment be delayed, Warden Sloan intentionally disregarded that risk by failing to see appropriate precautions were taken to keep Hanuman's condition from deteriorating while he was in transit from Baptist Hospital to RMC.  Warden Sloan did not ensure the transfer order was complied with; did not enforce policy 33-603.201(8) Florida Administrative Code; did not provide for an ambulance, medical staff, or life-saving or other medical equipment for the transport.  And Warden Sloan did not coordinate with Baptist Hospital regarding continuity of treatment during Hanuman's transport or provide any instructions to the

---

[1] While these allegations are not part of Plaintiff's Amended Complaint, Plaintiff will submit a motion for leave to file a second amended complaint including them.

corrections officers about their transporting a gravely ill inmate.  Instead, apprised of Hanuman's condition, Warden Sloan allowed Hanuman to be shackled in the back of a prison van for what turned out to be nearly a ten-hour journey from Baptist Hospital to RMC – a trip Hanuman did not survive.

Further, under a theory of supervisory liability, Defendants Ogunsanwo and Sloan implemented policies relating to the transport of ill inmates that were substantially certain to violate Hanuman Joyce's Eighth Amendment rights. Warden Sloan directed his subordinate corrections officers to act unlawfully or knew they would act unlawfully and failed to stop them.  The Defendants' failure to implement training on: transporting critically ill inmates; intervening if a health crisis occurs during a medical transport; and refraining from making unauthorized stops or detours during a medical transport all resulted in deliberate indifference to Hanuman's constitutional rights.  Further, the practice of Warden Sloan and Dr. Ogunsanwo not to provide ambulances, trained medical personnel, or medical equipment for the transport of critically-ill patients, not having FDOC staff coordinate with the hospital to ensure continuity of treatment during transport, and not disciplining corrections officers who took grossly excessive amounts of time making transports all resulted in or evidenced deliberate indifference to Hanuman's constitutional rights.

3. **Qualified Immunity Should Not Be Granted Here Because Hanuman's Eighth Amendment Rights Were Clearly Established at The Time of Defendants' Misconduct**

That an official acts with deliberate indifference when he intentionally delays providing an inmate with access to medical treatment, knowing that the inmate has an urgent, life-threatening condition that would be exacerbated by delay was clearly established at the time of Defendants' actions.

A right is clearly established if a reasonable official would understand that his conduct violates that right. *See Coffin v. Brandau*, 642 F.3d 999, 1013 (11th Cir. 2011) (en banc).   The touchstone of the "clearly established" inquiry is whether the official had "fair warning" that his conduct violated the constitutional right in question. *McClish v. Nugent*, 483 F.3d 1231, 1248 (11th Cir. 2007).  For the law to be clearly established, "case law must ordinarily have been earlier developed in such a concrete and factually defined context to make it obvious to all reasonable government actors, in the defendant's place, that what he is doing violates a federal law." *Priester v. City of Riviera Beach*, 208 F.3d 919 (11th Cir. 2000) (citations omitted). The Court looks to binding precedent in the decisions of the Supreme Court, the Eleventh Circuit, or the highest court of the state, to decide whether a right is clearly established. *Amnesty Int'l, USA v. Battle*, 559 F.3d 1170, 1184 (11th Cir. 2009). Typically, "[e]xact factual identity with a previously

decided case is not required, but the unlawfulness of the conduct must be apparent from the pre-existing law." *Coffin*, 642 F.3d at 1013 (citations omitted).

Here, as Dr. Ogunsanwo and Warden Sloan admit, the case law clearly established before this case arose that an official acts with deliberate indifference when he intentionally delays providing an inmate with access to medical treatment, knowing the inmate has an urgent, life-threatening condition that would be exacerbated by delay. See *Hill*, 40 F.3d at 1187 ("Cases stating a constitutional claim for immediate or emergency medical attention have concerned medical needs that are obvious even to a layperson because they involve life-threatening conditions or situations where it is apparent that delay would detrimentally exacerbate the medical problem."); *Harris v. Coweta County*, 21 F.3d 388, 394 (11th Cir.1994) (sheriff was not entitled to qualified immunity where he intentionally delayed treatment that sheriff knew had been prescribed for inmate's serious medical need); *Thomas v. Town of Davie*, 847 F.2d 771,773 (11th Cir. 1988) (failure to provide prompt attention to serious medical needs by delaying medical treatment for nonmedical reasons constitutes deliberate indifference).

Because Plaintiff has sufficiently pled that Dr. Ogunsanwo and Warden Sloan, while aware of Hanuman's urgent medical condition, knowingly delayed and deferred his medical treatment, and a denial in such circumstances violated his

clearly established Eighth Amendment rights, neither Dr. Ogunsanwo nor Warden

Sloan are entitled to qualified immunity at this stage of the proceedings.

## II. Plaintiff Has Stated a Claim Against Defendants Veera, Hof, and Sneed Under Florida Statute Section 395.1041 And Against Defendants Baptist Hospital, Veera, Hof and Sneed Under a Theory of Simple Negligence (Doc. No. 51)

The arguments of Baptist Hospital, Veera, Hof, and Sneed for dismissing the

claims against them (violation of F.S. Section 395.1041 and simple negligence)

are based on two conflations: (1) the Florida anti-dumping statute with the federal

anti-dumping statute; and (2) simple negligence with medical malpractice.

### A. Plaintiff Has Stated a Cause of Action Under F.S. Section 395.1041

Throughout this strand of their argument, Defendants Veera, Hof, and

Sneed[2] fail to appreciate the critical differences between Section 395.1041, the

Florida anti-dumping statute, and the federal Emergency Medical Treatment and

Active Labor Act, 42 U.S.C. 1395dd ("EMTALA").   Specifically, that the

language of 395.1041 is significantly *broader* than EMTALA, is not focused solely

on protecting the indigent, and its reach does not end at the emergency room doors.

Defendants' entire discussion, while a useful overview of EMTALA, is

inapplicable to Plaintiff's 395.1041 claim, which falls squarely within the plain

language of 395.1041.   Essentially, Defendants offer an artificially narrow reading

of 395.1041 which limits it to (a) indigent individuals who are (b) refused

---

[2] Baptist Hospital is not named as a defendant in the Section 295.1041 claim of Plaintiff's Amended Complaint.

emergency care.  But nothing in the express language or legislative intent of the statute lend credence to such a constricted reading.

Passed in 1986, EMTALA was initially intended to curtail the practice of hospital emergency rooms refusing to examine or treat indigent or uninsured patients, or that were inappropriately transferring them to other hospitals, i.e., "dumping" the patients.  EMTALA requires hospitals to examine all patients who come to emergency rooms. If patients are found to have a serious medical condition, they must be stabilized before discharge or transfer.  It creates a private cause of action on behalf of "any individual" who suffers "personal harm" as a result of a hospital's violation of these examination and stabilization requirements. Florida passed its own version of EMTALA in 1988, when it enacted F.S. § 395.1041.    While the Florida Legislature borrowed some language from EMTALA, it also expanded the duties of emergency room health care providers and created a private cause of action broader in scope than the cause of action provided under federal law.

*Contra* Defendants, F.S. §395.1041 contains no ambiguity as to its scope, and it does not mention the phrase "patient dumping" at all. The statute authorizes a civil cause of action to be brought by "any person" who has suffered "personal harm" as a result of a violation of the statute. Neither the duty to examine, nor the

duty to treat, is limited to poor or uninsured people. The language creating the private civil cause of action likewise contains no such words of limitation:

> (b) *Any person* who suffers personal harm as a result of a violation of this section or the rules adopted hereunder may recover, in a civil action against the responsible hospital administrative or medical staff or personnel, damages, reasonable attorney's fees, and other appropriate relief.

F.S. §395.1041(5)(b) (emphasis added).

Regardless of any rules of statutory construction, the primary reason it is inappropriate to look outside of the statute to decide what the legislature had in mind is that the statute itself contains direct expressions of the legislature's intentions, clearly labeled "legislative intent." First, there is a specific reference to the legislative intent for all of F.S. Ch. 395 in §395.001 which states:

> 395.001 Legislative intent. -- It is the intent of the Legislature to provide for the protection of public health and safety in the establishment, construction, maintenance, and operation of hospitals and ambulatory surgical centers by providing for licensure of same and for the development, establishment, and enforcement of minimum standards with respect thereto.

This language evidences a broad legislative intent to protect the public health by establishing minimum standards in operating hospitals. Nothing in the statement of legislative intent restricts the application of these laws for the protection of the health of only the poor or uninsured.

Because of differences in the language of EMTALA and F.S. §395.1041, reliance on cases decided under the federal statute should be done cautiously. It

must be pointed out, however, that even under EMTALA, every federal circuit court of appeals to have addressed the issue has ruled that whether a patient is indigent or carries health insurance is immaterial when a patient brings a claim under the federal act; all patients are protected. These federal courts concluded this because EMTALA in plain words creates a cause of action on behalf of "any individual." F.S. §395.1041 creates a cause of action on behalf of "any person."

Defendants additionally argue that F.S. §395.1041, like EMTALA, only comes into play where the patient is not given the standard medical *screening* examination that the hospital routinely gives to all patients similarly situated. Therefore, because Hanuman was screened and treated at Baptist Hospital before being transferred to RMC, the argument goes, Defendants cannot be liable under F.S. §395.1041. According to Defendants, F.S. §395.1041 only reaches the initial screening.  This is incorrect, owing to the material differences in the description of the duties required by the two statutes.

As stated above, the Florida Legislature borrowed the definition of an "emergency medical condition" from the federal statute. Beyond that, the language of Florida's statute departs considerably. EMTALA only requires "stabilization" of the emergency medical condition or transfer to a facility better able to treat the patient. Rather than require only stabilization, the Florida Legislature went further by requiring what it calls "emergency services and care," which it defined to

include "care, treatment or surgery by a physician necessary to relieve or eliminate the emergency medical condition."   Arguably, this exceeds the duty of mere "stabilization"; it requires treatment to eliminate the problem

In stark contrast to EMTALA, the Florida statute contains no requirement that before treatment must be rendered, the provider must actually make a diagnosis that the patient has an "emergency medical condition." Instead, the Florida statute merely says that every hospital "shall provide emergency services and care for an emergency medical condition when ... any person requests emergency services and care."

This language appears to create strict liability on the part of the health care provider any time an "emergency medical condition" exists and is untreated, irrespective of whether the health care provider actually makes a diagnosis that an emergency medical condition exists. While some plaintiffs may then argue F.S. §395.1041 creates strict liability for any failure to diagnose and treat an emergency medical condition, that is probably an unfair reading of §395.1041 as a whole. The parameters under which liability may attach against the provider are further clarified in §395.1041(3)(g), which adds:

> (g) Neither the hospital nor its employees, nor any physician, dentist, or podiatrist shall be liable in any action arising out of a refusal to render emergency services or care if the refusal is made after screening, examining, and evaluating the patient, and is based on the determination, exercising reasonable care, that the person is not suffering from an emergency medical condition or a determination,

exercising reasonable care, that the hospital does not have the service capability or is at service capacity to render those services.

In other words, under Florida's statute, as long as the health care provider actually conducts the required "screening, examination, and evaluation" of the patient, and, using reasonable care, concludes there is no "emergency medical condition" (or if there is, it is beyond the service capability or capacity of the hospital to treat it), then there will be no civil liability for failure to treat. This exculpation from civil liability is a clear indication of the legislative intent as to when civil liability will be imposed. *To state it affirmatively*, rather than negatively, liability is imposed under F.S. § 395.1041 if a patient suffers personal harm because 1) the health care provider refuses to render any examination of the patient; *or* 2) the health care provider conducts an examination, but falls below the standard of reasonable care in doing so, and for that reason fails to provide the necessary treatment for the condition.

Here, Plaintiff alleges, in a great detail, a failure of the latter variety, i.e., that Defendants failed to provide the necessary treatment for Hanuman's condition and that his treatment at Baptist Hospital and transfer to RMC violated F.S. §395.1041. Specifically, as to Defendants Surendar S. Veera, M.D., Scott Hof, M.D., and Amanda Sneed, R.N., Plaintiff alleges that they: failed to oppose Corizon Health Inc.'s and Dr. Ogunsanwo's requests to discharge Hanuman even though Hanuman's condition was not stable; failed to re-evaluate Hanuman prior to his

discharge; failed to stabilize Hanuman prior to his discharge; failed to comply with internal policies and procedures for patients being transferred in similar medical circumstances; prematurely released Hanuman despite the fact that he was gravely ill; failed to provide corrections officers with discharge instructions; and failed to request and demand safe conditions for Hanuman Joyce's transport to RMC despite his grave condition. (AC, ¶ 158 - 60).

In sum, Plaintiff's averments that Hanuman was not monitored and evaluated while at Baptist Hospital, and was transferred to RMC while still gravely ill and with no safeguards to keep his condition from further deteriorating sufficiently state a claim under F.S. § 395.1041.

### B. Plaintiff Has Stated a Cause of Action for Negligence

Defendants claim that Count III of the AC, a negligence claim pled in the alternative, is in fact a medical malpractice claim, which under Florida law, must abide by the strictures of Chapter 766 of the Florida Statues.  Because it does not, Defendants' argument goes, the claim should be dismissed.

While Plaintiff agrees that the presuit requirements apply to state-law medical-negligence claims in federal and state court and to those brought by prisoners and others and concedes that she did not comply with the presuit requirements. However, those requirements do not apply to her claims, because the claims are for *negligence* that does not constitute *medical negligence.*

23

It is clear that a prisoner can assert a negligence claim against a defendant without complying with the presuit requirements, even when medical care is involved, so long as the claim does not assert medical negligence. *See, e.g., Harris v. Sheriff, Jefferson Cnty. Fla*., 460 F. App'x 896 (11th Cir. 2012) (per curiam) (upholding a county jail inmate's negligence claim against a sheriff for delay in providing medical care; the plaintiff did not comply with the presuit requirements, and no issue was made of the failure); *Nobles v. Corrections Corp. of America*, No. 4:07cv288, 2008 WL 686962 (N.D. Fla. March 12, 2008) (dismissing a prisoner's medical negligence claim for violating the presuit requirements but upholding a claim based on other negligence). A claim asserts medical negligence if the claim will succeed only on a showing that the defendant—or a person for whose acts a defendant is vicariously liable—violated the standard of care applicable to a medical professional of the relevant kind. *See, e.g., Svenningson v. Prison Health Servs., Inc*., No.6:07cv1716, 2007 WL 3340453, at *2 (M.D. Fla. Nov. 9, 2007) (holding the presuit requirements applicable because "the resolution of this case will require the application of the prevailing professional standard of care for a healthcare provider").

In this context, the Florida Supreme Court in *J.B. v. Sacred Heart Hospital of Pensacola*, 635 So.2d 945 (Fla.1994), ruled the key inquiry is whether the action "'aris[es] out of any medical, dental, or surgical diagnosis, treatment, or care.'" *Id.*

at 947 (quoting § 95.11(4)(b), Fla. Stat.). If doubt exists on the applicability of the statute, the Supreme Court held "the question is generally resolved in favor of the claimant." *Id.*   In analyzing the statute of limitations issue in *J.B.*, the Supreme Court accorded "diagnosis," "treatment," and "care," their ordinary meanings:

> In ordinary, common parlance, the average person would understand 'diagnosis, treatment, or care' to mean ascertaining a patient's medical condition through examination and testing, prescribing and administering a course of action to effect a cure, and meeting the patient's daily needs during the illness. This parallels the dictionary definitions of those terms. According to Webster's Third International Dictionary (1981), 'diagnosis' means 'the art or act of identifying a disease from its signs and symptoms.' 'Treatment' means 'the action or manner of treating a patient medically or surgically.' 'Care' means 'provide for or attend to needs or perform necessary personal services (as for a patient or child).' Likewise, in medical terms, 'diagnosis' means '[t]he determination of the nature of a disease.' 'Treatment' means '[m]edical or surgical management of a patient.' And 'care' means 'the application of knowledge to the benefit of ... [an] individual.'

*Id.* at 948 (quoting *Silva v. Sw. Fla. Blood Bank, Inc.*, 601 So.2d 1184, 1187 (Fla.1992)).

In *J.B.*, J.B.'s brother, L.B., an AIDS patient, was receiving treatment from Sacred Heart Hospital in Pensacola, Florida. According to the complaint, the hospital was requested by its medical staff to have L.B. transferred to another treatment facility in Alabama. Because social services could not provide transport by ambulance, J.B., a layman with no medical training, was contacted and agreed to drive L.B. to Alabama, all the while under the impression that L.B. was suffering from Lyme's Disease. L.B. was released to J.B.'s care with a raging fever

and a heparin lock in his arm. During the trip, L.B. "'began to thrash about and accidentally dislodged the dressing to his heparin lock causing J.B. to reach over while driving in an attempt to prevent the lock from coming out of L.B.'s arm.'" *J.B.*, 635 So.2d at 947 (quoting the complaint). J.B. came into contact with fluids seeping from around the lock site and subsequently contracted AIDS. He sued the hospital for negligence in arranging the transportation, "in that it knew of L.B.'s condition, the level of care that would be required in transporting him, and the risk involved[.]" *Id*. The questions presented to the Supreme Court were whether section 95.11(4)(b) applied to bar the action, and whether chapter 766 applied to the action. In deciding whether the statute of limitations in section 95.11(4)(b) applied to defeat J.B's claim against the hospital, the Supreme Court concluded that *Silva v. Southwest Florida Blood Bank, Inc*., was dispositive. It said:

> According to the allegations in J.B.'s complaint, at the time the Hospital contacted him to drive his brother to Alabama, J.B. had no medical condition for which he sought medical services at the Hospital. His injury arose solely through the Hospital's use of him as a transporter. The simple question we must decide is whether this injury arose from the Hospital's medical diagnosis, treatment, or care of J.B. Applying the law as set forth in Silva, we conclude that it did not. Accordingly, this suit is not a medical malpractice action for chapter 95 purposes and the two-year statute of limitations is inapplicable.

*Id*. (emphasis added).

As for the application of chapter 766, the Supreme Court read § 766.106(1)(a), Fla. State (defining a claim for medical negligence), and § 766.202,

Florida Statutes (defining "medical negligence" as "medical malpractice"), "in conjunction" and concluded "chapter 766's notice and presuit screening requirements apply to claims that 'aris[e] out of the rendering of, or the failure to render, medical care or services.'" *Id*. at 949 (citing § 766.106(1)(a)). Looking to the allegations in the complaint, the Supreme Court noted J.B. claimed the hospital was negligent in using him to transport his brother. It observed the complaint "does not allege that the Hospital was negligent in any way in the rendering of, or the failure to render, medical care or services to J.B." *Id*. Accordingly, it concluded the complaint did not "state a medical malpractice claim for chapter 766 purposes, and the notice and presuit screening requirements [were] inapplicable." *Id*.

Here, just as in *J.B.*, we are dealing with a negligent transport.  And, again, just as in *J.B.*, Plaintiff's claimed injuries do not stem from Defendants' provision of a medical diagnosis, treatment, or care to appellant, but from simple negligence. Plaintiff alleges that Defendants failed to reevaluate Hanuman prior to his discharge from Baptist Hospital, allowed Hanuman Joyce to be discharged despite his grave condition, and discharged him to the custody of the FDOC with no discharge instructions or trying to prevent his condition from further deteriorating. (AC, ¶ 165).  One does not need to be a medical professional to know that you should not shackle a gravely ill man, alone, in the back of a prison van for what was ultimately a ten-hour trip.  Plaintiff does not allege that Defendants failed to

follow the applicable standard of medical care, but that they were negligent in abandoning Hanuman to transport by the FDOC without taking *any action* to ensure that Hanuman's condition did not further deteriorate. Such an elementary abdication of responsibility sounds in ordinary negligence.

### C. Baptist Hospital Is Not Named in the §395.1041 Count and Chandra Kantor Is the Sole Plaintiff In This Action

Defendants' two remaining arguments – that Baptist Hospital is not a proper defendant under Florida's anti-dumping statute and that Chandra Kantor is the only proper plaintiff to this action – have both been addressed in the AC and therefore do not warrant further discussion. Baptist Hospital is no longer named in Count II and Chandra Kantor is not the only named plaintiff.

### III. There Is a Basis for Recovery of Attorneys' Fees Under Both State and Federal Law and Plaintiff's Claim for Punitive Damages Against Dr. Haitham Qadar Is Not Premature (Doc. No. 50)

In his motion to dismiss, Dr. Haitham Qadar makes two arguments: (1) there is no basis for recovery of attorneys' fees; and (2) a claim for punitive damages is premature. Both are incorrect. Both 42 U.S.C. § 1983 and F.S. Section 395.1041 provide for attorneys' fees. And under F.S. Section 768.72, punitive damages require a showing of gross negligence or intentional misconduct. Here, Plaintiff has sufficiently alleged Dr. Qadar's treatment of Hanuman Joyce, or lack thereof, was tantamount to gross negligence, entitling her claim for punitive damages against him to proceed.

## IV.    Amenability to Amendment

Plaintiff may need to further elaborate or more clearly articulate her causes of action. Plaintiff will seek to further amend the Complaint. Plaintiff granted Defendants requested extensions of discovery deadlines and in so doing also delayed receipt of information and records further supporting her causes of action as to each of the Defendants. Plaintiff requests that any dismissal be made with leave to amend and will seek such leave in a separate motion.

## CONCLUSION

For the reasons stated above, Plaintiff respectfully requests that the Court deny Defendants' motions to dismiss.

## CERTIFICATE OF WORD LIMITATION

In compliance with N.D. Fla. Loc. R. 7.1(F), this Response contains 6,640 words, excluding case style, signature block, and certificates.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing Notice of Appearance was served via ECF filing system, on December 16, 2016, on any counsel registered to receive notice on the CM-ECF electronic filing system.

Dated: December 16, 2016                              Respectfully submitted,

_____

JAMES V. COOK, ESQ.
Florida Bar Number 0966843
Law Office of James Cook

314 West Jefferson Street
Tallahassee, FL 32301
(850) 222-8080
(850) 561-0836 fax
cookjv@gmail.com


JACK MEYERSON, ESQ.
EDWARD H. SKIPTON, ESQ.
jmeyerson@meyersonlawfirm.com
eskipton@meyersonlawfirm.com
Meyerson & O'Neill
1700 Market Street
Suite 3025
Philadelphia, PA 19103
(215) 972-1376

ROBERT L. HERBST (RH 8851)
HERBST LAW PLLC
420 Lexington Avenue, Suite 300
New York, New York 10170
(646) 543-2354
rherbst@herbstlawny.com

*Attorneys for PLAINTIFF*