## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
## PENSACOLA DIVISION

CHANDRA KANTOR, Individually and as
Personal Representative of the Estate of
Hanuman Joyce, and Survivors, Chandra
Kantor, Mother and Ramayana Baba,
Father,

Plaintiff,

v.                                        Case No.:  3:16-CV-449-RV-GRJ

WARDEN JOHN SLOAN, et al,

Defendants.

_____/

## DEFENDANTS', CORIZON HEALTH, INC., DANIEL CHERRY, MD, AND CHRISTINE NOBLES, RN'S,  MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO COUNT I

Defendants CORIZON HEALTH, INC, DANIEL CHERRY, MD, and

CHRISTINE NOBLES, RN, hereby file their Motion for Partial Summary

Judgment as to Count I, and in support thereof, state as follows:


**I.     STATEMENT OF CLAIM**

Plaintiff, Chandra KANTOR, Individually and as Personal Representative of

the Estate of Hanuman Joyce, and Survivors, sues Defendants, CORIZON

HEALTH, INC, DANIEL CHERRY, MD, AND CHRISTINE NOBLES, RN, and

alleges that these Defendants' conduct constituted "deliberate indifference" in

violation of the deceased, Hanuman Joyce's Eighth Amendment right to be free from cruel and unusual punishment.

## II.    STATEMENT OF FACTS

### a. DEFENDANTS' ROLE IN CARE OF HANUMAN JOYCE AT CENTURY CORRECTIONAL INSTITUTION PRIOR TO TREATMENT AT BAPTIST HOSPITAL

1. After arrival at Century Correctional Institution in 2014, Mr. Joyce's lupus nephritis was being followed and treated by the Chief Health Officer, Dr. Allen Ho.  Part of that treatment included monitoring the patient using 24 hour urine protein tests, the first of which was conducted on May 29, 2014. (Exhibit 1)

2. Mr. Joyce refused more than one 24 hour urine protein tests during August 2014 despite the recommendations of Dr. Ho, indicating his mother, Chandra KANTOR had instructed him not to undergo the test.  (Exhibit 2)

3. On August 21, 2014, Dr. Ho also scheduled Mr. Joyce for a nephrology consult to be conducted at the Reception Medical Center.  (Exhibit 1)  Mr. Joyce likewise refused to attend the scheduled and approved consultation. (Exhibit 2)

4. Mr. Joyce refused another 24 hour urine protein test on September 15, 2014 and then refused an influenza B shot on November 8, 2014. (Exhibit 2)

5. Then, on January 25, 2014, Mr. Joyce reported to the medical department with complaints of a running nose and a cough that had lasted 2 weeks. (Exhibit 3)

6. After Mr. Joyce's apparent cold symptoms did not improve, Mr. Joyce was admitted to the infirmary at Century Correctional Institution on February 20, 2015 and Dr. Ho ordered bloodwork. (Exhibit 4)

7. While in the infirmary, Dr. Ho received the results from the bloodwork and ordered Mr. Joyce be transported to the Baptist Hospital Emergency Room in Pensacola, Florida. (Exhibit 4)

8. While awaiting transport, the Department of Corrections security officers brought Mr. Joyce back to the Corizon medical department, indicating they had observed Mr. Joyce having a seizure. (Exhibit 4)

9. Dr. Ho ordered Mr. Joyce to be transported by ambulance and a 911 call was made to Escambia County EMS. (Exhibit 5)

10. The CAD report for Escambia County EMS indicated a call had been made citing as the complaint that an "inmate had had a seizure."   At the time of the call, it was not known to EMS personnel whether the inmate was diabetic, epileptic, had a history of stroke, had experienced more than one seizure, or if the observed twitching had stopped. (Exhibit 6)

11. Once the EMS personnel arrived on scene, Mr. Joyce was evaluated and placed in the ambulance for transport.   The transport from Century Correctional Institution to Baptist Hospital was deemed "Non Emergency." (Exhibit 6)

12. During transport, Mr. Joyce's vital signs were consistently within normal range. (Exhibit 5)

### b.  DEFENDANTS' ROLE IN CARE OF HANUMAN JOYCE WHILE HE WAS RECEIVING TREATMENT AT BAPTIST HOSPITAL

13. Once Mr. Joyce was transported to Baptist Hospital as ordered, Dr. Ho was never told nor did he have any independent knowledge of the treatment provided to Mr. Joyce while at Baptist Hospital.  (Exhibit 7, Deposition of Ho, 17:5-8)

14. It was only after Mr. Joyce was transported to Baptist Hospital that NOBLES, the Utilization Management nurse for CORIZON, learned of Mr. Joyce's illness for the first time.  (Exhibit 9, ¶4)

15. In her role as the Utilization Management nurse, NOBLES did not provide medical treatment to Mr. Joyce.   Rather she monitored his status as a hospitalized patient, reported back to the Program Manager on site, and provided daily inpatient reports to the Health Services Administrator and Health and Human Services staff. (Exhibit 9, ¶3)

16. In his role as Statewide Medical Director, CHERRY did not provide medical treatment to inmates.  Rather he monitored referrals to outside health care facilities for appropriateness, quality, and continuity of care. (Exhibit 10, ¶4)

17. NOBLES also coordinated with hospital utilization management nurses and to arrange discharge plans as the liaison between Corizon Corporate Utilization Management, and the off-site hospital staff. (Exhibit 9, ¶3)

18. NOBLES' only direct involvement with Mr. Joyce's medical treatment was the daily monitoring of his treatment and progress while receiving medical treatment at Baptist Hospital from February 21, 2015 to March 2, 2015. (Exhibit 9, ¶4)

19. As part of her daily monitoring, NOBLES received Utilization Reviews from UM Nurse Amanda Sneed at Baptist Hospital via facsimile.  Those reviews contained information from the Baptist Hospital chart, including lab reports and consultation reports and other notes from the physicians and nurses treating Mr. Joyce. (Exhibit 11)

20. The first utilization review provided by Amanda Sneed on February 23, 2015 to NOBLES included lab results as well as the February 21, 2015 consultation reports for Dr. Clements, Dr. Douglas Bunting, Dr. Padmavathis Veera, Dr. Scott Hof, as well as for Dr. Kristyn Baker.  Dr.

5

Clements indicated he was evaluating Mr. Joyce for "fever, influenza B, and acute renal failure."  Mr. Joyce reported to Dr. Clements he had been experiencing chills and passing out spells with sore throat and cough. (Exhibit 11)

21. Dr. Clements' impression was that Mr. Joyce suffered from Influenza B, renal insufficiency, elevated liver enzymes, and a history of lupus.  His plan was to treat his influenza, monitor his labs.  He notes that, at the time, Mr. Joyce did not appear toxic, did not seem to have meningismus, was coherent, and was not encephalopathic.  (Exhibit 11)

22. Dr. Douglas Bunting's consultation note was also provided to NOBLES as part of the utilization review documents sent from Baptist Hospital.  Dr. Bunting examined Mr. Joyce and found that he was suffering from influenza B and acute renal failure associated with likely chronic renal failure, noting his history of lupus. (Exhibit 11)

23. Dr. Kristyn Baker was consulted to evaluate Mr. Joyce regarding what she describes as a "possible seizure." She obtained a history from Mr. Joyce who indicated he "might" have experienced a seizure and was brought to the emergency room. (Exhibit 11)  He likewise told Dr. Baker that he did not have a history of seizures. (Exhibit 11)

24. Dr. Baker conducted a neurological exam of Mr. Joyce and considered the results of a lumbar puncture, a CT of the brain, an MRI of the brain, and an MRA that was ordered to rule out aneurysm.  The CT of the brain and MRI of the brain were normal. The MRA showed no aneurysm.  Based on this information and the fact that her exam showed no focal neurological deficits, Dr. Baker recommended NOT starting MR. Joyce on any anti-epileptic medications. (Exhibit 11)

25. Based on all of the consultations done at the ER, the decision was made to admit Mr. Joyce to the hospital.  Tamiflu was started as was IV fluid hydration.  The plan was to monitor Mr. Joyce's renal and liver functions and further plan depending on his stay at the hospital. (Exhibit 11)

26. NOBLES received two additional Utilization Reviews faxed from Amanda Sneed.  The second review was dated February 26, 2015 and included some new lab work and a note that Mr. Joyce was still not clinically stable for discharge.  (Exhibit 11)

27. The third and final Utilization Review was faxed from Amanda Sneed to NOBLES on March 2, 2015.  The note from Amanda Sneed informed NOBLES that Mr. Joyce was to be discharged back to the facility with a follow-up need with Dr. Qader in one month. (Exhibit 11)

28. Likewise, CHERRY did not examine, evaluate, or treat Hanuman Joyce for any of his medical complaints. His only direct involvement with his medical treatment was daily monitoring of his treatment and progress while receiving medical treatment at Baptist Hospital from February 23, 2015 to March 2, 2015. (Exhibit10 ¶5)

29. NOBLES' monitoring also consisted of a review of the daily clinical medical data that she received, often by phone, from Baptist Hospital nurse, Amanda Sneed.  (Exhibit 9, ¶5)

30. This data was placed on a spreadsheet by NOBLES and was then forwarded to the Regional Medical Director, Dr. CHERRY, among others.  (Exhibit ¶5) (Exhibit 30)

31. From a review of the information and medical records provided to her by Baptist Hospital nurse Amanda Sneed, NOBLES believed that Mr. Joyce's condition was improving. (Exhibit 9, ¶6)

32. As was his duty, CHERRY simply reviewed the daily clinical medical data that was forwarded to him via spreadsheet by Utilization Management nurse NOBLES, based on the records and information provided to her by Baptist Hospital.   CHERRY never reviewed any medical records related to Hanuman Joyce.  (Exhibit 10, ¶6) (Exhibit12, Deposition of Cherry, 6:5-9:17, 26:19-23)

8

33. CHERRY did not deny Hanuman Joyce medical treatment for any medical concerns or symptoms. He also never disregarded or otherwise ignored any of his medical needs.  (Exhibit 10, ¶6)

34. Based on his medical background and a review of Hanuman Joyce's medical clinical data on a daily basis, it appeared to CHERRY that Hanuman Joyce's condition improved over the course of his hospital stay at Baptist Hospital.   (Exhibit 10, ¶7)

35. Dr. Veera was the attending hospitalist who, in consultation with multiple specialists, recommended the discharge of Mr. Joyce from Baptist Hospital. At the time of discharge, Dr. Veera had determined that Mr. Joyce was in clinically stable condition. (Exhibit 13, Deposition of Veera, 45:1-46:14) Dr. Veera explained that his determination that Mr. Joyce was in clinically stable condition was based on multiple factors such as blood work and vital signs in addition to both a physical examination of Mr. Joyce and a conversation with Mr. Joyce regarding any physical complaints he may have.  (Exhibit 13, Deposition of Veera, 45:1-46:14, 132:9-133:3)

36. Dr. Veera reiterated that Mr. Joyce was so stable at discharge, that he could have walked from the hospital to his destination or even spent the day at Disney World if he had not been an incarcerated individual. (Exhibit 13,

Deposition of Veera, 28:2-10, 37:24-39:3, 43:10-12, 46:10-14, 132:13-16, 140:19-22)

37. Dr. Qader, the consulting nephrologist at Baptist Hospital, also indicated that Mr. Joyce was stable at the time of discharge and explained that a patient like Mr. Joyce could be stable despite having a chronic condition such as lupus nephritis. (Exhibit 14, Deposition of Qader, 196:3-197:9) Dr. Qader further stated that on discharge, Mr. Joyce was "stable as an ox." (Exhibit 14, Deposition of Qader, 188:5-20)

38. Dr. Qader agreed that Dr. Veera, as the hospitalist, was the person responsible for deciding the mode of transport for Mr. Joyce upon discharge. (Exhibit 14, Deposition of Qader, 204:18-205:4)

39. At the point of discharge from Baptist Hospital, the Century Correctional Institution Chief Health Officer, Dr. Ho, did not and would not have been expected to play any role in the decision to discharge Mr. Joyce. (Exhibit 15, Deposition of Nobles, 27:17-28:3) (Exhibit 7, Deposition of Ho, 13:11-15)

40. Dr. Ho was not informed of any of the medical treatment being provided to Mr. Joyce during his stay at Baptist Hospital. (Exhibit 7, Deposition of Ho, 17:5-8, 20:5-17)   He was likewise not consulted with regarding the timing

of Mr. Joyce's discharge from Baptist Hospital. (Exhibit 7, Deposition of Ho, 23)

41. CHERRY was not involved in the decision to discharge Mr. Joyce from Baptist Hospital. (Exhibit 12, Deposition of Cherry, 26:4-6)

42. Neither NOBLES nor CHERRY would be expected to intervene in any way in the treatment being provided by Baptist Hospital as it related to Mr. Joyce.  (Exhibit 16, Deposition of Ogunsanwo, 85:4-13)  Likewise, it was the sole decision of Baptist Hospital regarding what testing needed to be done, what medications needed to be prescribed, and when Mr. Joyce was ready to be discharged. (Exhibit 16, Deposition of Ogunsanwo, 85:14-87:4)

43. Mr. Joyce was ultimately discharged without a prescription for anti-seizure medications of any kind. (Exhibit 17)

### c. DEFENDANTS' ROLE IN DECISION TO DISCHARGE/TRANSPORT HANUMAN JOYCE FROM BAPTIST HOSPITAL TO RECEPTION MEDICAL CENTER

44. When NOBLES was informed that Hanuman Joyce was ready for discharge by Baptist Hospital case manager, Amanda Sneed, she was told Hanuman Joyce was in stable condition.  (Exhibit 9, ¶7)

45. The discharge UM notes from Baptist Hospital indicated Mr. Joyce could be discharged back the institution. (Exhibit 18)

46. Prior to ultimately being discharged, Mr. Joyce's mother, Chandra KANTOR made a plea to HSA Owens among others for her son to be transferred to the Reception Medical Center instead of back to Century Correctional Institution.  In an email dated February 26, 2015, she refers to her son having systemic lupus erythematosus, viral meningitis, hepatopathy, and encephalopathy.  (Exhibit19)  KANTOR did not make reference in her email to a possible seizure occurring or to a seizure disorder.

47. KANTOR then forwarded her email to Dr. Ogunsanwo with the Department of Corrections. (Exhibit 19)  Dr. Ogunsanwo then forwarded the email to CHERRY noting that Mr. Joyce's mother was requesting that he be sent to RMC on discharge.   CHERRY agreed with the recommendation and commented that Mr. Joyce's hospitalization was likely from an exacerbation from the flu, further clarifying that Mr. Joyce did not have meningitis as his mother stated. (Exhibit 19)

48. This February 26, 2015 email chain was never forwarded to NOBLES. (Exhibit 19)

49. On March 2, 2015, NOBLES notified CHERRY and HSA Owens via email that Mr. Joyce was going to be discharged from Baptist Hospital back to Century Correctional Institution. (Exhibit 20)  In this email, she stated that Mr. Joyce had been observed over the weekend after receiving his Cytoxin,

that his labs had improved even though his BUN was still elevated.  She further noted that Mr. Joyce was no longer on IV steroids or Predisone and that his next scheduled Cytoxin treatment was set for March 27, 2015. (Exhibit 20)  Based on this information, NOBLES recommended that Mr. Joyce be transported back to Century CI for monitoring until the referral could be made for his next Cytoxin treatment. (Exhibit 20)

50. Upon receipt of this information, Dr. Ogunsanwo of the Department of Corrections instead recommended that Mr. Joyce go to RMC even if not to the hospital so that he could be monitored by a specialist.  (Exhibit 20)

51. This recommendation was forwarded to NOBLES and CHERRY by Dr. Ogunsanwo's assistant, Donna Graham.  CHERRY noted that he agreed with Dr. Ogunsanwo's recommendation. (Exhibit 20)

52. Based on the emailed recommendation, NOBLES then coordinated the destination for Mr. Joyce after his discharge.  (Exhibit 9, ¶8)

53. NOBLES contacted the Reception Medical Center to ensure that a bed was available for Mr. Joyce upon his arrival.  Once she received confirmation from the Reception Medical Center, she spoke with Amanda Sneed at Baptist Hospital regarding the discharge and transfer to the Reception Medical Center and was told that, per Dr. Veera, Mr. Joyce could be

transported from the hospital by Department of Corrections van.  (Exhibit 9, ¶9) (Exhibit21, Deposition of Sneed, Vol. II, 37:6-11, 62:20-63:7)

54. NOBLES promptly emailed CHERRY and Dr. Ogunsanwo that she had made the recommended arrangements for Mr. Joyce to be transferred to RMC on the same day. (Exhibit 20)

55. Prior to receiving the discharge summary that was dictated by Dr. Veera after Mr. Joyce's death, NOBLES was given verbal discharge instructions by Baptist Hospital's nursing supervisor before the discharge actually took place.  She was told specifically "PO medications.  No need for oxygen.  Ambulating.  Follow up in a month with the physician for follow-up labs." (Exhibit 15, Deposition of Nobles, 39:13-24)

56. According to at least two medical records, the medical personnel at Baptist Hospital were aware that Mr. Joyce would be travelling to the Reception Medical Center as opposed to Century Correctional Institution. (Exhibit 22)

57. Nurse Sneed indicated that while she may not have known exactly where the Reception Medical Center was location, she believed it to be in Tampa, Florida. (Exhibit 21, Deposition of Sneed, Vol. II 4:13-5:2)  She further indicated that she understood that the transport that was recommended would be long trip. (Exhibit 21, Deposition of Sneed, Vol. II 5:5-8)

58. The decision regarding mode of transport for Mr. Joyce from Baptist Hospital to the Reception Medical Center, was a decision that the attending physician at Baptist Hospital made.  (Exhibit 15, Deposition of Nobles, 23:10-25)  NOBLES' role was simply to accept the recommendation of the attending physician. (Exhibit 15, Deposition of Nobles, 24:1-6, 12-21)

59. Based on the recommendations of the Baptist Hospital physician who had discharged Mr. Joyce from his care, NOBLES completed the required Transfer Order so that the Department of Corrections could coordinate the pickup and transfer of the inmate for a transport directly from Baptist Hospital to the Reception Medical Center. (Exhibit 9, ¶ 10)

60. While Dr. Veera stated did not know exactly where Mr. Joyce would be transferred, he had no concerns about the distance that Mr. Joyce would be travelling to his final destination upon discharge since Mr. Joyce was in stable condition.  (Exhibit 13, Deposition of Veera, 152:13-20)

61. NOBLES generated what is known as a SYSM, or the notification that is sent to multiple parties within the Department of Corrections regarding an inmate transport.  Authored at 3:49 p.m., the notification indicates that Mr. Joyce was to be transported for medical services directly from Baptist Hospital to RMC Hospital in Lake Butler. (Exhibit 23)

62. The SYSM indicates the transfer request is urgent as opposed to emergency. (Exhibit 23)

63. NOBLES testified that "urgent" in this context means "the same day." (Exhibit 15, Deposition of Nobles, 79:15-80:2)

64. Finally, the notification further clarified that Century CI would transport the inmate direct from Baptist Hospital via DC van to RMC. (Exhibit 23)  This information was provided to multiple parties within CORIZON, Century Correctional Institution, and the Reception Medical Center. (Exhibit23)

65. Then, at 4:22 p.m., the Department of Corrections, after receipt of the request for transfer from NOBLES, provided final authorization for the transport to occur.  (Exhibit 24)

66. Prior to his discharge, CHERRY had no knowledge as to how Hanuman Joyce would be transported from the hospital upon discharge. For this reason, he did not recommend any particular type of transportation be used for the transport as that was the decision of the attending physician who discharged him. (Exhibit 10, ¶ 9) (Exhibit12, Deposition of Cherry, 9:22-24)

67. CHERRY did not provide any medical instruction, assistance, or provision regarding Mr. Joyce's transport and he does not have knowledge of what instruction, assistance or provision was provided, nor does he know what personnel was used for the transport.  (Exhibit 10, ¶10)

68. In his discharge summary, Dr. Veera did not list seizure as a diagnosis and notes that Mr. Joyce was seizure free during his hospital stay (Exhibit 25) Likewise, Dr. Veera did not make any reference to systemic lupus erythematous (SLE) at all, not in his discussion, in his pre-admission diagnosis, nor in his discharging diagnosis.  (Exhibit 25)  Finally, the discharge summary indicates that Mr. Joyce was in stable condition and was to be discharged to the prison hospital. (Exhibit 25)

69. At no point did NOBLES or CHERRY have an understanding or concern that Hanuman Joyce was at risk for having a seizure during transport, regardless of the means of transportation.  (Exhibit 9, ¶15) (Exhibit 10, ¶11)

70. At no point did anyone inform NOBLES or CHERRY that Hanuman Joyce was at risk for having a seizure during transport, regardless of the means of transportation.  (Exhibit 9, ¶16) (Exhibit 10, ¶12)

71. NOBLES never recommended or decided on the method of transportation for Mr. Joyce. (Exhibit 9, ¶11-12)  Likewise, Dr. Ho, at the institutional level never recommended or decided on the method of transportation. (Exhibit 7, Deposition of Ho, 13:16-21, 20:18-20)  (Exhibit 8, Deposition of Owens, 88:6-89:1)

72. NOBLES did not check box (D) on the SYSM indicating that the "losing chief health officer has coordinated the continuity of care with the gaining

chief health officer" because it was not applicable to Mr. Joyce's transfer given that the Baptist attending physician was the one who coordinated the care. (Exhibit 15, Deposition of Nobles, 56:14-21)

73. NOBLES was not informed nor was she otherwise aware that Mr. Joyce was "bedfast" prior to his discharge.  She was specifically told he was ambulating.  (Exhibit 15, Deposition of Nobles, 57:16-58:19)(Exhibit 23)

74. NOBLES was not told that Mr. Joyce would need any medical assistance during his transport.  She would not have ignored any transportation recommendations from the physicians and nurses who had actually been providing hands on care to Mr.  Joyce.  She was off-site and her role was simply to facilitate and coordinate Mr. Joyce's transport, not to make the judgment call on whether and how he should be transported.  (Exhibit 9, ¶17)

75. Shortly after the transport order was completed, Lt. Kenneth Shaw, with the Florida Department of Corrections, was informed by security at Century Correctional Institution that Mr. Joyce was being discharged from Baptist Hospital in Pensacola.  (Exhibit 26, ¶4)

76. It was near the end of Lt. Shaw's shift on March 2, 2015 when he left Century Correctional Institution for Baptist Hospital.  Officer Burris accompanied him on the transport.  (Exhibit 26, ¶5)

77. When he arrived at Baptist Hospital, Lt. Shaw interacted with Mr. Joyce, who appeared pleasant and cooperative.  At no point did Mr. Joyce express any concerns to Lt. Shaw about his medical condition nor did he express any concerns to Lt. Shaw about being discharged from Baptist Hospital. Mr. Joyce was likewise able to stand from his bed and walk on his own without assistance from Lt. Shaw or Officer Burris. (Exhibit 26, ¶6)

78. Just prior to Mr. Joyce's discharge, Lt. Shaw was informed by a nurse at Baptist Hospital that Mr. Joyce would be transported to the Reception Medical Center.  Mr. Shaw did not know until he arrived at Baptist Hospital that Mr. Joyce was scheduled for transport to RMC.  (Exhibit 26, ¶7)

79. Because of the length of the transport from Baptist Hospital to RMC, Lt. Shaw asked whether Mr. Joyce needed any special accommodations for his medical needs and was told that Mr. Joyce was stable for discharge and did not have any special needs.  Because Lt. Shaw was aware that Mr. Joyce had been in the hospital for over a week, he asked specifically whether he needed an ambulance or a medical transport to make the long trip to RMC. Again, the nurse told Lt. Shaw that Mr. Joyce could be transported by DOC van.  She repeated to Lt. Shaw that the inmate was stable and did not need any special medical attention for his transport. (Exhibit 26, ¶8)

80. Lt. Shaw never received any instructions from NOBLES, CHERRY or any other CORIZON employee about the method of transport for Mr. Joyce. The only person he spoke with about the method of transport was the Baptist Hospital nurse who was present with him and Mr. Joyce when he was being discharged.  (Exhibit 26, ¶9)

### d. DEFENDANTS' ROLE IN ACTUAL TRANSPORTATION OF HANUMAN JOYCE FROM BAPTIST HOSPITAL TO RECEPTION MEDICAL CENTER

81. When it came time to leave the hospital, Mr. Joyce was able to walk on his own, without assistance to the transport van and at no point before, during, or after the transport did he indicate to Lt. Shaw that he did not feel well. (Exhibit 26, ¶10)

82. Because of the length of the trip, it was necessary for Officer Burris and Lt. Shaw to stop at Century Correctional Institution instead of going directly to RMC in order for new officers to be assigned to the transport. (Exhibit 26, ¶11)

83. NOBLES had no knowledge that Mr. Joyce would not be transported directly from Baptist Hospital to the Reception Medical Center as ordered. (Exhibit 9, ¶13)

84. Prior to his death, NOBLES was not aware that the Department of Corrections transporting officers would be making a stop at Century

Correctional Institution before transporting Mr. Joyce to the Reception

Medical Center.  (Exhibit 9, ¶14)

85. Upon arrival at Century Correctional Institution, Mr. Joyce was escorted

from the transport van into the Visitors' Park which is a large room located

near the loading area for the transport vans.  Mr. Joyce was led to a chair

wearing wrist cuffs only for restraints.  He walked into the room and sat

down without assistance and he did not express any concerns about his

health to Lt. Shaw during this time.  The room was air conditioned, had two

working water fountains, and accessible restrooms in the event that Mr.

Joyce got thirsty or needed to use the restroom.  He was free to move

around the room as needed.  Mr. Joyce remained in the Visitors' Park for

approximately 45 minutes until it was time be transported to RMC.

(Exhibit 26, ¶12)(See also video footage of this 45 minute time period

attached hereto as Exhibit 27)

86. Lt. Shaw never had any communications with anyone from the medical

department while he prepared the transport van and the inmate for the

transport.  (Exhibit 26, ¶13)

87. Officers Carthan and Farish were assigned to transport Mr. Joyce from

Century Correctional Institution to RMC.  Mr. Joyce never expressed to

Carthan or Farish that he felt sick or that he felt the need for medical assistance during his transport. (Exhibit 28, Deposition of Farish, 44:23-19)

88. Officer Farish did not have any concerns about Mr. Joyce's medical condition as it related to his transport. (Exhibit 28, Deposition of Farish, 46:2-7)

89. Prior to leaving Century Correctional Institution for the Reception Medical Center, the transporting officers did not seek the advice of the Chief Health Officer regarding the transfer of Mr. Joyce. (Exhibit 7, Deposition of Ho, 29:10-16, 32:14-19) (Exhibit 15, Deposition of Christine Nobles, 23:10-25) (Exhibit 28, Deposition of Farish, 43:17-21) (Exhibit 29, Deposition of Carthan, 29:10-12) (Exhibit 8, Deposition of Owens, 88:6-89:1)

90. The transporting correctional officers never alerted anyone from the Corizon medical department that the inmate was back at Century Correctional Institution for any period of time during the transport. (Exhibit 8, Deposition of Owens, 99:4-100:5)

91. HSA Owens noted that, in his experience, when an inmate was transferred directly from Baptist Hospital to the Reception Medical Center, the transporting van did not make a stop at Century Correctional Institution. (Exhibit 8, Deposition of Owens, 80:3-11) He also indicated that the only way anyone from the CORIZON medical department would be aware of the

inmate's presence in the event of a stop like the one that occurred in this case, would be if the correctional staff made contact with the medical department.  (Exhibit 8, Deposition of Owens, 80:12-81:3)

92. NOBLES entire Utilization Management file is attached to further document exactly what she knew throughout Mr. Joyce's hospital stay through the time of discharge. (Exhibit 31)

## III.  ARGUMENT

In Count I against Defendants, Plaintiff calls into question the circumstances surrounding the unfortunate death of inmate, Hanuman Joyce on March 3, 2015. Despite extensive discovery which included the production of videos and photographs, thousands of pages of documents between all of the parties, the taking of nearly 30 depositions, the inspection of both the DOC transport van in which Mr. Joyce was found deceased as well as the sally port in which the transport van was parked at the time of death, there remains the question of why Mr. Joyce died.

Thought Plaintiff will argue that Mr. Joyce had a seizure while being transported that ultimately caused his death, Plaintiff cannot present evidence that CORIZON, CHERRY or NOBLES knew of and appreciated that risk.  Likewise, there is not one scintilla of evidence that such a risk was ignored in a deliberate

attempt to harm or further punish Mr. Joyce.  Such is required in order for Plaintiff to succeed in claim against Defendants for the alleged violations of Mr. Joyce's rights.

## COUNT I—ALLEGED VIOLATION OF 42 U.S.C. §1983 BY CORIZON, NOBLES, AND CHERRY

### APPLICABLE LEGAL STANDARD

Plaintiff alleges in the Third Amended Complaint that the remaining Defendants, CORIZON, NOBLES, and CHERRY, violated Hanuman Joyce's Eighth Amendment right to be free from "cruel and unusual punishment."  The Eighth Amendment's prohibition against "cruel and unusual punishment" includes "deliberate indifference to the serious medical needs of prisoners."  *Bingham v. Thomas*, 654 F.3d 1171, 1175 (11thk Cir. 2011)(quoting *Estelle v. Gamble,* 429 U.S. 97, 106 (1976)).    The amendment is applicable to the states through the Fourteenth Amendment.  *Id.* at 1175.   To prevail on a claim for unconstitutional medical treatment, Plaintiff must allege acts or omissions sufficiently harmful to evidence "deliberate indifference." *Estelle* at 106.  Not every claim of inadequate medical treatment states a violation of the Eighth Amendment. *McElligot v. Foley,* 182 F.3d 1248, 1254 (11th Cir. 1999)(quoting *Estelle,* 429 U.S. at 105).  Rather, the facts alleged must be "so grossly incompetent, inadequate, or excessive as to shock the conscience or be intolerable to fundamental fairness." *Harris v. Thigpen,*

941 F.2d 1495, 1505 (11th Cir. 1991)(quoting *Rogers v. Evans,* et al., 792 F.2d 1052, 1058 (11th Cir. 1986)). Moreover, under the *Estelle* standard, there is no requirement that the medical care provided to an inmate "be perfect, the best obtainable, or even very good." *Harris,* at 1510.

To establish Defendants acted with deliberate indifference to his medical needs, Plaintiff must satisfy two requirements.   First, there must be, objectively speaking, conduct by public officials "sufficiently serious" to constitute a cruel or unusual deprivation—one "denying 'the minimal civilized measure of life's necessities.'" *Wilson v. Seiter*, 501 U.S. 294, 298, 111 S. Ct. 2321, 115 L. Ed. 2d 271 (1991) (quoting *Rhodes v. Chapman*, 452 U.S. 337, 347, 101 S. Ct. 2392, 69 L. Ed. 2d 59 (1981)). Second, there must be a subjective intent by the public officials involved to use the sufficiently serious deprivation in order to punish. See *Wilson*, 501 U.S. at 300 ("The source of the intent requirement is not the predilections of this Court, but the Eighth Amendment itself, which bans only cruel and unusual punishment. If the pain inflicted is not formally meted out as punishment by the statute or the sentencing judge, some mental element must be attributed to the inflicting officer before it can qualify." (emphasis in original))

Under the objective component, "deliberate indifference to medical needs amounts to an Eighth Amendment violation only if [the] needs are 'serious.'" *Id.* (quoting *Hudson v. McMillian,* 503 U.S. 1, 9 (1992)); *and see Taylor v. Adams,*

221 F.3d 1254, 1257 (11th Cir. 2000)(plaintiff must set forth evidence of an objectively serious medical need).  A medical need is determined serious only if it "has been diagnosed by a physician as mandating treatment or [is] one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Hill,* 40 F.3d at 1187.    Whether diagnosed or obvious, the medical need must be "one that, if left unattended, poses a substantial risk of serious harm." *Taylor,* 221 F.3d at 1258 (alteration in original)(*quoting Farmer,* 511 U.S. at 834).

Under the subjective component, Plaintiff must show there was **both** a "need for medical care and the intentional refusal to provide care," for his claims to constitute deliberate indifference.  Plaintiff must prove that a prison official knew of and disregarded an excessive risk to inmate health or safety. *Hill,* 40 F.3d at 1186 (*quoting Mandel v. Doe,* 888 F.2d 783, 788 (11th Cir. 1989). *See also Farmer v. Brennan,* 511 U.S. 825 (1994).  The Eleventh Circuit has reiterated that mere negligence or even gross negligence does not satisfy this standard. *Cottrell v. Caldwell,* 85 F.3d 1480, 1490 (11th Cir. 1996).    Rather, the satisfaction of both an objective **and** subjective inquiry is required for a prisoner to show a Constitutional violation. *Farrow v. West*, 320 F. 3d 1235, 1243 (11th. Cir. 2003) Plaintiff must demonstrate the defendants had an "aware[ness] of facts from which the inference could be drawn that a substantial risk of serious harm exists" and the **actual** "draw[ing] of the inference." *Farmer,* 511 U.S. at 837.

Further, the Eleventh Circuit has held that "[a]n inmate who claims that delay in medical treatment rose to a constitutional violation must place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment to succeed." *Hill* 40 F. 3d at 1188. Otherwise, an inmate can succeed if the verifying medical evidence proves that the treatment received was so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness. This cannot be accidental or the result of mere oversight of mistake. The defendant must purposefully ignore or fail to respond to a prisoner's pain or medical need. *Brown v. Hughes,* 894 F. 2d 1533, 1538-39 (11th Cir. 1990); *Rogers v. Evans,* 792 F. 2d 1052, 1058 (11th Cir. 1986). Essentially, it must be "so cursory as to amount to no treatment at all…." *Ancata v. Prison Health Services,* 769 F. 2d 700 (11th Cir. 1985). Where an inmate has received medical attention and the dispute is over the adequacy of the attention, courts should be reluctant to question the accuracy or appropriateness of the medical judgments that were made. *Harris* at 1507 (quoting *Waldrop v. Evans,* 871 F. 2d 1030, 1035 (11th Cir. 1989))(emphasis added)

## LEGAL STANDARD APPLIED TO EVIDENCE

Upon a reading of the Complaint, it is clear that the allegations themselves don't present a valid claim for a constitutional violation. First, it is important to

note that, despite the conclusory allegation included in paragraph 125 that CORIZON "was aware of a history of widespread and longstanding abuse and deliberately indifferent treatment by its employees" and in paragraph 131 (m) that CORIZON had "a longstanding and widespread history of abusive and deliberately indifferent failure to provide treatment to Florida prison inmates," there has been absolutely zero evidence obtained or provided by the Plaintiff to support these allegations.  Likewise, despite the language in paragraphs 132(m) and 133(m), there is no evidence that CHERRY or NOBLES failed "to act to abate the known risk of a widespread and long history of abusive and deliberately indifferent failure to provide medical treatment to Corizon and its staff."

Second, as to the remainder of the list that is repeated throughout this Count of the alleged violations by CORIZON, NOBLES, and CHERRY included in paragraphs 131,132, and 133, five of the thirteen items listed appear to apply to inmates in general and not specifically to Hanuman Joyce and are therefore not to be included in the analysis of any alleged constitutional violation.

Rather, only 8 of the allegations relate to Mr. Joyce specifically.  As to these listed items, Defendants argue that the Plaintiff have failed to meet their burden of proof as to each of the following allegations because Plaintiff cannot show that CORIZON, CHERRY, or NOBLES had actual knowledge of a risk of serious harm to Mr. Joyce following his discharge from Baptist Hospital.  Similarly,

Plaintiff cannot show that CORIZON, CHERRY, or NOBLES, disregarded an excessive risk to Mr. Joyce's safety or health in an effort to further punish Mr. Joyce.

The evidence is undisputed that not even the physicians and nurses who had been treating Mr. Joyce for 10 days at Baptist Hospital had any concerns about his discharge or his transport from the hospital.  None of them believed or expressed to anyone at CORIZON that there was a continued risk of seizure or any other complication for Mr. Joyce.  Mr. Joyce had not experienced a seizure for 10 days while hospitalized despite never being started on anti-seizure medications.  He was likewise not discharged with any anti-seizure medications and the only follow-up recommended was for Mr. Joyce to see the nephrologist in one month.  Dr. Veera, Dr. Qader, the Baptist Hospital nurses, and Lt. Shaw from the DOC, all indicated that upon discharge, Mr. Joyce was pleasant, had no complaints of any medical concerns, and was able to walk alone without assistance.  Most of his labs had completely improved and the ones that were not had been trending positive.  He was stable.

In anticipation of Plaintiff's arguments on this point, even with lab values that showed Mr. Joyce was still anemic at the time of discharge, the totality of the evidence does not paint the picture of a seriously ill individual.  Far from it.  The

evidence is certainly not the kind that would alert NOBLES or CHERRY that Mr. Joyce may die within hours of discharge.

As to the specific failures cited by Plaintiff, each allegation will now be addressed separately even though redundant to properly illustrate the lack of evidence as to a constitutional violation as to any of the Defendants:

**a) Failed to ensure that the transfer order was implemented such that transport officers were aware of need to secure and follow discharge instructions from Baptist Hospital, and make sure MR. JOYCE was able to take medication and hydration at appropriate times.**

This allegation, while perhaps asserting the basis of a negligence claim, does not satisfy the strict requirements of a constitutional violation. In order for this failure to be actionable pursuant to §1983, there must be evidence that the Defendants KNEW that by not "making transport officers aware of the need to secure and follow discharge instructions" or not "making sure that Mr. Joyce was able to take medication and hydration at appropriate times," that they were subjecting Mr. Joyce to a risk of serious harm. The law is clear that the Defendants would actually have to "draw that inference," in order for this allegation to have merit. Because there is no evidence that either Defendant "drew the inference" of harm, they cannot be found to have violated Mr. Joyce's constitutional rights.

As detailed in the Statement of Facts, the evidence in this case is undisputed that NOBLES nor CHERRY believed Mr. Joyce's transport from Baptist Hospital

to the Reception Medical Center placed him at risk of serious harm of any kind, i.e., they did not KNOW that Mr. Joyce would be at risk during this transport. On the contrary, both NOBLES and CHERRY stated emphatically that they believed the inmate's condition had improved or was improving at the time of discharge. There is nothing in the records or other evidence in this case to suggest otherwise. Whether Mr. Joyce, at the time of discharge, had lab values that should have been concerning to NOBLES or CHERRY is a separate analysis. For NOBLES and CHERRY to be liable for a §1983 violation, it matters not what they should have known. The only inquiry rather is into what they actually knew.

What NOBLES actually knew was the Mr. Joyce was being discharged with only a scheduled follow-up in one month. There was nothing emergent about this recommendation. Likewise, he was not being sent home with anti-seizure medications and had not been on them the entire time he was hospitalized. She also knew, as did CHERRY, that Mr. Joyce had not experienced a seizure while in the hospital for 10 days.

The evidence is irrefutable that NOBLES and CHERRY merely agreed with the recommendations for discharge of Mr. Joyce. The decision to discharge Mr. Joyce from Baptist Hospital was not theirs. They did not even provide any input into the decision to discharge Mr. Joyce. Likewise, there is no dispute that NOBLES simply accepted the recommendation for the mode of his transportation

that was made by the hospitalist at Baptist Hospital.   Her role was to implement a decision made by the medical providers who had actually be treating Mr. Joyce. NOBLES' reliance on the expertise and hands-on treatment provided by Baptist Hospital, even if mistaken or misplaced, is not evidence of deliberate indifference.

Finally, it is undisputed that CHERRY had no knowledge whatsoever of the mode of transportation that was utilized for Mr. Joyce.     Whether CHERRY should have inquired as to which method would be used or as to what accommodations Mr. Joyce might need upon discharge from Baptist Hospital is an analysis for the negligence claim that has been brought against him and NOBLES. Any attempt however to hold him accountable for a constitutional violation regarding the use of a Department of Corrections van and all that entails is misplaced.

**b)   Failure to implement policy 33-603.201(8) Florida Administrative Code or discuss or consider or articulate or insist on the need for medical staff during the transport.**

Again, this allegation, while perhaps asserting the basis of a negligence claim, does not satisfy the strict requirements of a constitution violation.  In order for this failure to be actionable pursuant to §1983, there must be evidence that the Defendants KNEW that by not following the referenced Florida Administrative Code Provision that they were subjecting Mr. Joyce to a risk of serious harm.

NOBLES testified that she did not believe she needed the recommendations of Dr. Ho at Century Correctional Institution in order to complete the transfer. She likewise was not informed that Mr. Joyce would not be doing directly from Baptist to RMC as ordered.

Defendants anticipate that Plaintiff will argue that because Mr. Joyce was at Century Correctional Institution for nearly an hour awaiting the transport to RMC, he should have been evaluated by the Chief Health Officer. However, there is no evidence that anyone at Century Correctional believed Mr. Joyce was in distress or in any way in need of medical assistance. In fact, Lt. Shaw indicated Mr. Joyce was walking on his own, was pleasant, and never had any complaints regarding his medical situation.

Likewise, HSA Owens testified that in his experience at Century Correctional Institution for a number of years, transport officers did not stop at the institution when the transfer was direct from Baptist Hospital to RMC. For that reason, there was no expectation that anyone from the CORIZON medical department would even know the patient was there much less examine him.

Finally, it is important to note that, despite the misleading and inflammatory allegations in Plaintiff' Third Amended Complaint, Mr. Joyce had access to both restroom facilities and water fountains while he waited for nearly an hour for the transport to be completed. In fact, there is video footage of Mr. Joyce sitting

upright in a chair awaiting his transport.  He was not left shackled in a van as mischaracterized by Plaintiff.  Again, the image of Mr. Joyce and the testimony from the transporting officers do not paint a picture of a seriously ill inmate.

### c)  Failure to ensure that MR. JOYCE was transported from Baptist Hospital to RMC directly without unnecessary delays and provision of needed information to transporters.

The undisputed evidence is that NOBLES and CHERRY merely accepted the recommendation of Dr. Ogunsanwo to transport Mr. Joyce directly from Baptist Hospital to the Reception Medical Center.  Neither of them made the decision to transport Mr. Joyce for that distance.    It is also undisputed that NOBLES nor CHERRY were aware or informed that the transporting officers would be stopping at Century Correctional Institution after leaving Baptist Hospital and before completing the trip to the Reception Medical Center.   The decision to stop at Century CI and the further delays associated with the transport which are still unexplained, were things clearly not in the contemplation of NOBLES or CHERRY when they agreed on the discharge recommendations of Dr. Ogunsanwo and Baptist Hospital.

Should NOBLES or CHERRY have followed up with security to determine if any delays could be expected?  Should they have checked with security to make sure they followed the orders of their own supervising officers and Department of

34

Corrections guidelines regarding the transfer?  While Defendants will argue they had no duty to engage in such inquiries, such an analysis is nonetheless one to be made in order to determine if the defendants were negligent.  It's not whether NOBLES or CHERRY should have known or should have done a particular thing, it's what they actually knew or actually did that matters for purposes of §1983.

### d) Failure to seek or adequately articulate the need for medical transport  from Baptist to RMC, including ambulance, medical staff and equipment,   medication, and hydration.

Mr. Joyce was discharged for transport to RMC by Dr. Veera, the hospitalist that had been handling the care and treatment of Mr. Joyce during his stay at Baptist Hospital.   There is no dispute that Dr. Veera did not consult with CORIZON, NOBLES or CHERRY, regarding his decision to discharge Mr. Joyce. Likewise, he did not consult with them when providing his discharge instructions. NOBLES explained that she simply received verbal discharge instructions from Amanda Sneed of Baptist Hospital.

On this point, the record is replete with evidence that NOBLES' role in the discharge of Mr. Joyce was that she simply generated the transfer order based on the recommendations of the Baptist Hospital physicians.   It was also her responsibility to secure at bed at the Reception Medical Center for Mr. Joyce. Further, it is clear in the record that CHERRY accepted and indicated approval of

the decision to transport Mr. Joyce to the Reception Medical Center.   NOBLES testified, and her testimony is unrefuted, that she 100% followed the recommendations of the discharging physician when ordering the transport by Department of Corrections van as opposed to an ambulance.   There is ample evidence that her decision to act on those recommendations rather than coming to her own conclusion was not only acceptable, but expected of someone in the Utilization Management role that she held.   This was a transport from Baptist Hospital to the Reception Medical Center for Mr. Joyce to received routine follow-up care for his lupus nephritis.  It was never deemed an emergency transport or a transport in which the discharging physicians themselves had any concerns whatsoever about Mr. Joyce's physical condition.   It was likewise never deemed an emergency or cause for concern by any of the officers involved in Mr. Joyce's transport.   The fact remains that not a single person told NOBLES or CHERRY or any CORIZON staff member that the transport was even risky, much less emergency in nature.

NOBLES nor CHERRY were ever informed by anyone, not by Baptist Hospital, not by Dr. Ogunsanwo, and not by any Department of Corrections employees, that Mr. Joyce needed any special accommodations, medical or otherwise, for his transport.   Specifically, the discharge instructions given to

NOBLES did not include special provisions for hydration or medical staff and equipment.

As Defendants therefore they cannot be held liable for a "failure to seek or adequately articulate the need for medical transport…including ambulance, medical staff, and equipment, medication, and hydration," when they did not KNOW the needs existed.   Absent that knowledge or risk, there can be no deliberate disregard of the risk such that a violation could occur.

### h) Failure to monitor MR. JOYCE's medical status prior to transport to determine he had staffing, equipment, medication, hydration, and other medical needs for the trip.

NOBLES, CORIZON, and CHERRY monitored Mr. Joyce's medical status prior to his transport by reviewing medical data provided on a daily basis by Nurse Amanda Sneed from Baptist Hospital.    NOBLES kept CHERRY informed of the daily progress of Mr. Joyce.    Based on the medical information reviewed, NOBLES believed Mr. Joyce's was improving.    NOBLES was also aware that Dr. Veera had indicated Mr. Joyce was stable for discharge.  She conveyed this to CHERRY and CORIZON.

The allegation of Plaintiff that Defendants "failed to monitor Mr. Joyce's medical status prior to transport," is simply not true. It is undisputed that his condition was monitored and on a very regular basis.  Rather, Plaintiff seems to be alleging in this paragraph that the decision to not provide medical "staffing,

equipment, medication, hydration, and other medical needs for the trip" is somehow evidence that Defendants failed to monitor Mr. Joyce's condition. This convoluted allegation not only fails to state a basis for a constitutional violation, it likewise simply untrue that Mr. Joyce was not monitored by Defendants.

Finally, this allegation, while perhaps asserting the basis of a negligence claim, does not satisfy the strict requirements of a constitution violation. The law is clear that when the allegations focus on whether an inmate has received medical attention and the dispute is over the **adequacy** of the attention, courts should be reluctant to question the accuracy or appropriateness of the medical judgments that were made. *Harris v. Thigpen,* 942 F. 2d 1495, 1507 (11th Cir. 1991) (quoting *Waldrop v. Evans,* 871 F. 2d 1030, 1035 (11th Cir. 1989))(emphasis added). To do otherwise would be to constitutionalize claims that sound in tort law. *Hamm v. DeKalb County,* 774 F. 2d 1567, 1575 (11th Cir. 1985). Whether Mr. Joyce was adequately monitored is therefore not a basis for a §1983 claim.

### j)   Failure to ensure, specifically, that MR. JOYCE had his seizure medication available and some way to take it or have it administered to him at the appropriate times.

This allegation against Defendants is entirely unsupported by the evidence. At no point during his hospitalization was Mr. Joyce started on any anti-seizure medications.   He was therefore also not discharged from Baptist Hosptial with any anti-seizure medications by Dr. Veera.   Without anti-seizure medication

38

being prescribed, there can be no violation for failing to administer it or make it available to Mr. Joyce.  For this reason, this allegation cannot serve as a basis of §1983 violation or even negligence for that matter.

### k)  Unreasonably hastening the discharge of MR. JOYCE from Baptist Hospital.

Defendants argue that there is no evidence in the record that Mr. Joyce was somehow discharged early, much less that he was his discharged was "hastened" by CORIZON or NOBLES or CHERRY for any reason.  Rather, Dr. Veera is adamant that he decided, without consulting with Defendants, that Mr. Joyce was ready for discharge.  It can be inferred from the wording of this allegation that Plaintiff believe Defendants had an incentive, monetary or otherwise, to discharge Mr. Joyce before he was ready.  There is simply no evidence to that effect. NOBLES also testified that she never made decisions for financial reasons.

It is undisputed that the decision to discharge Mr. Joyce was left to the physicians at Baptist Hospital alone.   For that reason, any allegations regarding Mr. Joyce being discharged too early or before he was ready are appropriate only as to Baptist Hospital and can therefore not form the basis of a constitutional violation against Defendants.

**l) Failure to demand and order that the transport of MR. JOYCE be postponed until all the necessary measures for a safe transport could be implemented.**

As stated previously, neither NOBLES nor CHERRY were informed that Mr. Joyce needed any safety or medical measures for his transport. Likewise, neither of them independently believed or had concerns about his safety during transport. Without evidence that either of them were actually concerned, they cannot be held responsible for failing to postpone the transport to account for concerns that neither of them actually had. This allegation presumes that Defendants were worried about Mr. Joyce's medical condition upon discharge from Baptist Hospital, but the record of evidence in this case speaks otherwise. And that record is undisputed.

**CONCLUSION**

Once Mr. Joyce was admitted to Baptist Hospital, his medical condition was monitored on a daily basis by CORIZON via its Utilization Management Nurse NOBLES. She received medical records to review and also spoke regularly with Utilization Management Nurse Amanda Sneed from Baptist Hospital. NOBLES made notes in a spreadsheet and forwarded that information daily to her Regional Medical Director, Dr. CHERRY. From the first day to the last day at Baptist Hospital, Mr. Joyce's course of treatment was handled by Baptist Hospital, not CORIZON. However, at the end of a ten day stay at the hospital, NOBLES was

told that the hospitalist, Dr. Veera, was discharging Mr. Joyce back to his institution in stable condition.  Every person who was able to put eyes on Mr. Joyce from February 22, 2015 through March 2, 2015, both medical staff and lay people like correctional staff, believed that Mr. Joyce's condition was improving with time.  Not one of them expressed any concerns to NOBLES or CHERRY about Mr. Joyce being discharged from the hospital or about transporting Mr. Joyce in a Department of Corrections van.

The only person who expressed concerns was Mr. Joyce's mother.  That Mr. Joyce ended up at RMC as opposed to Century Correctional Institution is evidence that her concerns were taken seriously.  But her concerns are only part of the picture, and on many points, her concerns and statements made about her son's condition did not match the medical picture being provided by the hospital and the lab work.  Nothing in the medical workup Mr. Joyce received at Baptist Hospital indicated he was encephalopathic or that he had meningitis despite his mother's belief to the contrary.  Even so, what ultimately matters for the analysis of whether Plaintiff' have provided evidence sufficient to support an Eighth Amendment claim for a §1983 violation is not what Chandra KANTOR believed or what she knew.  What matters is what NOBLES, CHERRY, or CORIZON actually knew or believed to be the case.  Their respective beliefs are more than reasonable in light

of the medical evidence provided to them.  Clearly, nothing about their responses or actions to the medical information "shocks the conscience."

Neither NOBLES nor CHERRY had any knowledge that Mr. Joyce was at risk for serious injury or death when they agreed to the discharge plan laid out by Baptist Hospital.   They did not know that Mr. Joyce was at risk for serious injury or death when they agreed to send him in a DOC van as recommended by Baptist Hospital.  They did not know that Mr. Joyce was at risk for serious injury or death because even aside from the recommendations of Baptist Hospital, both CHERRY and NOBLES believed, in their own medical judgment that Mr. Joyce's condition had improved to the point that he was not in any danger for discharge or transport. Importantly, neither of them knew of these possibilities NOT because they ignored medical evidence or turned a blind eye to an emergency situation.  No, they did not know precisely because they did review and analyze the medical data as they received it.  Like the other physicians and nurses who treated Mr. Joyce, CHERRY and NOBLES came to the same conclusions. Mr. Joyce was stable at the time of discharge, stable enough to be transported in a van as opposed to an ambulance.

Again, whether they should have done something more or different than what done in this case is the analysis for the medical negligence claim.  While Defendants do not believe there is evidence in the record that even rises to the level of medical negligence, ***a claim for deliberate indifference requires conduct rising***

*to a level above even gross negligence or Plaintiff's claim for deliberate indifference fails*. *Redding v. Georgia,* 557 Fed. Appx. 840 (11th Cir. 2014); *see also Faulkner v. Monroe County Sheriff's Department,* 523 Fed. Appx. 696 (11th Cir. 2013) (emphasis added)

For all of the reasons stated herein and because there is no dispute as to the lack of knowledge or the appreciation or risk the Defendants had related to Mr. Joyce's medical condition, Defendants respectfully request that this Court grant Defendants' Motion for Partial Summary Judgment as to Count I of Plaintiff's Third Amended Complaint.

## CERTIFICATE OF WORD LIMITATION

In accordance with N.D. Fla. Loc. R. 7.1(F), the number of words in the memorandum, which excludes the case style, signature block, and certificates, is 9,244.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on January 16, 2018, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day via transmission of Notices of Electronic Filing generated by CM/ECF to those counsel or parties who are registered to receive Notices of Electronic Filing in this case.

/s/:  *Jami M. Kimbrell*
JAMI M. KIMBRELL